1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO LOPEZ-GOMEZ,<br><br>               Petitioner,<br><br>   v.<br><br>ALBERTO GONZALES, Attorney General,<br><br>               Respondent. | Case No. 08-cv-1276-W(RBB)<br><br>**ORDER GRANTING RESPONDENT'S UNOPPOSED MOTION FOR SUMMARY JUDGMENT [DOC. 36]** |

On June 12, 2008, Petitioner Antonio Lopez-Gomez filed a petition for review of a Board of Immigration Appeals ("BIA") order entered on October 2, 2006. That order affirmed an immigration judge's decision finding Petitioner removable as charged under § 212(a)(6)(A)(I) of the Immigration and Nationality Act ("INA") and denying Petitioner's motion to terminate proceedings based on his claim to derivative citizenship. Now pending before the Court is Respondent's motion for summary judgment. To date, Petitioner has not opposed.

The Court decides the matter on the papers submitted and without oral argument. <u>See</u> Civ. L.R. 7.1(d.1). For the following reasons, the Court **GRANTS** Respondent's unopposed motion for summary judgment.

# I.    BACKGROUND[1]

Stephen Caldera, who is also known as Trinidad Caldera and Estaban Caldera, is Petitioner's father. (SOF ¶¶ 1–2.) He was born on September 2, 1925, in Buena Park, California. (Id. ¶ 2.) According to a Baptismal Certificate, Stephen Caldera was baptized on September 20, 1925 in the Church of Saint Boniface in Anaheim, California. (Id. ¶ 3.) He attended the Lindbergh School of the Buena Park School District between 1932–1936 and for half of the 1938–1939 school year. (Id. ¶ 4.) According to the Buena Park School District, they "could find no evidence of attendance for the school years 1936/37 or 1937/38." (Id. ¶ 5.)

On July 26, 1937, the California Department of Motor Vehicles issued Jesus Caldera, Petitioner's paternal grandfather, an Operator's License, indicating that he resided in Buena Park, California. (SOF ¶¶ 6, 8.) And a Lindbergh Parents and Teachers Association membership card indicates that Mariana Caldera, Petitioner's paternal grandmother, was a member of the association from 1938 to 1939. (Id. ¶¶ 7, 9.)

In 1936, Jesus Caldera sought a settlement with the Mexican government regarding the repatriation of land in Baja California, Mexico. (SOF ¶ 10.) On August 2, 1939, the Mexican Consulate indicated that Jesus Caldera had proved that he was a Mexican citizen, and granted him a certificate of residence for repatriation to Baja California, Mexico. (Id. ¶ 11.) That same year, Jesus Caldera was repatriated into Mexico, taking his household goods and accompanied by his son Stephen and his wife Mariana Caldera. (Id. ¶ 12.) The Mexican government gave Jesus Caldera approximately 20 hectares of land, and Stephen Caldera helped his father work the land. (Id. ¶ 13.)

According to Respondent, "[t]here is no documentary evidence regarding the physical whereabouts of Stephen Caldera, from August 3, 1939 (the time he repatriated

---

[1] Because this summary-judgment motion is unopposed, the background is taken almost exclusively from Respondent's motion and Statement of Facts ("SOF"). For convenience, the Court will cite to the SOF, which in turn cites to Respondent's exhibits.

1   to Mexico with his family) to November 26, 1973, a more than thirty-four year period."

2   (SOF ¶ 14.)   Respondent also presents evidence that shows that "[a] search of United

3   States Census Records yielded no information Stephen Caldera ever resided in the

4   United States from 1930 to 1960." (Id. ¶ 15.)

5         On October 16, 1968, Petitioner was born in Ensenada, Mexico.  (SOF ¶ 16.)

6         On November 26, 1973, Stephen Caldera was issued his first identification card

7   as a resident citizen of the United States.  (SOF ¶ 17.)  He does not recall how long he

8   was present in the United States prior to the birth of his son, or where he permanently

9   resided between 1925 and 1968.  (Id. ¶¶ 18–19.)  Stephen Caldera also does not

10  remember when he started working for Sebastian and Cruz Sedillo, and how long he

11  worked for them; he could not even approximate how many years he worked for them.

12  (Id. ¶ 20.)  Stephen Caldera could not approximate how long he would stay in the

13  United States or Mexico during the time he worked for the Sedillos.  (Id. ¶ 21.)

14  However, at an unspecified time between 1961 to the early 1970s, Stephen Caldera

15  worked in Mexico for "Russians who owned a chocolate and olive tree plantation." (Id.

16  ¶ 22.)

17        Margarita Gomez is Petitioner's mother.  (SOF ¶ 23.)   She was born on

18  November 4, 1940 in Mexico.  (Id. ¶ 24.)  Margarita Gomez married Rosalio Lopez on

19  July 19, 1957.  (Id. ¶ 25.)  Though Petitioner's birth certificate lists Rosalio Lopez as his

20  biological father, Respondent proceeds under the premise that Petitioner's biological

21  father is Stephen Caldera based on Petitioner's and Stephen Caldera's testimony.  (See

22  id. ¶ 26; Resp't's Ex. J; Stephen Caldera Dep. 22:8–9; Antonio Lopez-Gomez Dep.

23  9:19–23.)

24        Petitioner has the following four half-siblings who were all born in Ensenada,

25  Mexico to parents Margarita Gomez and Rosalio Lopez: (1) half-sister Josefina Lopez-

26  Gomez, currently Josefina Saak, who was born on March 19, 1959; (2) half-sister Maria

27  Elena Lopez, currently Maria Centeno, who was born on June 6, 1961; (3) half-sister

28  Rosa Maria Lopez-Gomez, currently Rosa Maria Luttrull, who was born on May 19,

1964; and (4) half-brother Jose Jesus Lopez-Gomez, who was born on August 30, 1966. (SOF ¶¶ 26–29.) Each of Petitioner's half-siblings testified that they remember Stephen Caldera from their childhood. (Id. ¶¶ 30–35.) Josefina Saak testified that Stephen Caldera would visit her house in Mexico, and the Sedillos would come to her home in Mexico to drive Stephen Caldera to Wilmington, California between 1968 to 1972. (Id. ¶ 31.) Maria Centeno and Rose Maria Luttrull testified that they had similar memories around roughly the same time period. (Id. ¶¶ 33–34.)

In 1974, Margarita Gomez and her children moved to the United States to live with Stephen Caldera. (SOF ¶ 37.) And on July 8, 1974, Stephen Caldera began working for the Corona Foothill Lemon Company in Corona, California. (Id. ¶ 38.)

On June 24, 1975, Margarita Gomez and Rosalio Lopez divorced. (SOF ¶ 39.) Then on July 14, 1975, Margarita Gomez and Stephen Caldera married in Riverside, California. (Id. ¶ 40.)

Sometime thereafter, the government initiated removal proceedings against Petitioner. (See Resp't's Ex. DD.) The immigration judge originally ordered Petitioner removed on May 24, 2005, but Petitioner filed an appeal. (Id.) The parties subsequently jointly moved to remand because new evidence existed regarding Petitioner's citizenship claim. (Id.) The BIA granted the motion on January 17, 2006. (Id.) Petitioner then filed a motion to terminate the removal proceedings, which the immigration judge denied on April 25, 2006. (Id.) Petitioner then appealed the decision to the BIA. (See id.) On October 2, 2006, the BIA dismissed the appeal. (Id.)

On October 31, 2006, Petitioner Antonio Lopez-Gomez filed a petition for review of the BIA order entered on October 2, 2006 in the Ninth Circuit Court of Appeals. That order affirmed an immigration judge's decision finding Petitioner removable as charged under § 212(a)(6)(A)(I) of the INA and denying Petitioner's motion to terminate proceedings based on his claim to derivative citizenship. On November 20, 2007, upon reviewing Petitioner's opening brief and Respondent's

-4-

pending unopposed motion to transfer, the Ninth Circuit transferred this matter to the district court "for a *de novo* review on Petitioner's claim to United States citizenship" pursuant to 8 U.S.C. § 1252(b)(5)(B) after "find[ing] that a genuine issue of material fact exists as to petitioner's claim of United States citizenship." (Doc. 2.) The district court action commenced on June 12, 2008. Now pending before the Court is Respondent's motion for summary judgment. To date, Petitioner has not opposed.

## II.    LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir.

2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing <u>Richards v. Combined Ins. Co. of Am.</u>, 55 F.3d 247, 251 (7th Cir. 1995)).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  <u>Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing <u>Anderson</u>, 477 U.S. at 242, 252).  Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  <u>See Matsushita</u>, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  <u>Anderson</u>, 477 U.S. at 255.

A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition.  <u>Cristobal v. Siegel</u>, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994).  The court may, however, grant an unopposed motion for summary judgment if the moving party's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact.  <u>See Carmen</u>, 237 F.3d at 1029.

//

1    III.    DISCUSSION[2]

2              Under the burden-shifting framework for removal proceedings articulated by the

3    Ninth Circuit

> [T]he DHS [Department of Homeland Security] bears the
> burden of establishing by clear, unequivocal, and convincing
> evidence, all facts supporting deportability. *Evidence of*
> *foreign birth gives rise to a rebuttable presumption of alienage,*
> *shifting the burden to the alleged citizen to prove citizenship.*
> Upon his production of substantial credible evidence in
> support of his citizenship claim, the presumption of alienage
> is rebutted. The DHS then bears the ultimate burden of
> proving the respondent removable by clear and convincing
> evidence.

9    Mondaca-Vega v. Holder, 718 F.3d 1075, 1081 (9th Cir. 2013) (emphasis added).

10   Though the party claiming citizenship is the respondent during the removal

11   proceedings, in the *de novo* hearing in district court, that party is in the position of a

12   plaintiff seeking a declaratory judgment.  See Sanchez-Martinez v. Immigration &

13   Naturalization Serv., 714 F.2d 72, 74 n.1 (9th Cir. 1983).  In a *de novo* hearing on

14   citizenship, the petitioner seeking a "declaratory judgment finding that he is a United

15   States citizen . . . has the burden of proving his citizenship by a preponderance of the

16   evidence in order to prevail." Graham v. Holder, No. CV 12-00066-PHX-JAT, 2013

17   WL 5445525, at *1 (D. Ariz. Sept. 30, 2013) (citing 28 U.S.C. § 2201; Sanchez-

18   Martinez, 714 F.2d at 74 n.1; Yee Tung Gay v. Rusk, 290 F.2d 630, 631 (9th Cir.

19   1961)).

20             There are "two sources of citizenship, and two only: birth and naturalization."

21   United States v. Wong Kim Ark, 169 U.S. 649, 702 (1898).  "Within the former

22   category, the Fourteenth Amendment of the Constitution guarantees that every person

23   'born in the United States, and subject to the jurisdiction thereof, becomes at once a

24   citizen of the United States, and needs no naturalization.'" Miller v. Albright, 523 U.S.

25   423, 423-24 (1998) (quoting Wong Kim Ark, 169 U.S. at 702).  "Persons not born in

26   the United States acquire citizenship by birth only as provided by Acts of Congress."

27   ───────────────────

28        [2] The Court finds that there are no genuine issues of material fact.  Though Court does note
     however that there is conflicting evidence regarding Petitioner's biological father, but that issue is not
     in dispute.

1    Id.  "The applicable law for transmitting citizenship to a child born abroad when one

2    parent is a U.S. citizen is the statute that was in effect at the time of the child's birth."

3    Scales v. Immigration & Naturalization Serv., 232 F.3d 1159, 1162-63 (9th Cir. 2000)

4    (internal quotation marks omitted).  Petitioner asserts that he acquired citizenship at

5    the time of birth under the former Immigration and Nationality Act ("INA") §

6    301(a)(7) (1968) (recodified without change as INA § 301(g) in 1978), 8 U.S.C. §

7    1401(a)(7).  See Scales, 232 F.3d at 1163.

8          In 1968, the year of Petitioner's birth, the applicable statute provided, in

9    pertinent part, that a person shall be a national and citizen of the United States at birth

10    if the petitioner is

11               a person born outside the geographical limits of the United
                 States and its outlying possessions of parents one of whom is
12               an alien, and the other a citizen of the United States who,
                 prior to the birth of such person, was physically present in the
13               United States or its outlying possessions for a period or
                 periods totaling *not less than ten years, at least five of which*
14               *were after attaining the age of fourteen years.*

15    8 U.S.C. § 1401(a)(7) (1968) (redesignated in 1978 as § 1401(g)) (emphasis added).[3]

16    Applied to this case, Petitioner must demonstrate by a preponderance of the evidence

17    that Stephen Caldera, a United States citizen and Petitioner's father, was physically

18    present in the United States for ten years between September 2, 1925 (Stephen

19    Caldera's date of birth) and October 16, 1968 (Petitioner's date of birth), five years of

20    which must have been after Stephen Caldera's fourteenth birthday on September 2,

21    1939.  See id.  Respondent argues that Petitioner fails to satisfy his burden because he

22    lacks adequate evidence.  The Court agrees.

23          In addition to documentary evidence, credible testimony and written declarations

24    can also provide a basis for a petitioner to establish a parent's physical presence in the

25    United States.  See Vera-Villegas v. Immigration & Naturalization Serv., 330 F.3d

26    1222, 1225 (9th Cir. 2003).  Focusing first on the five years of physical presence

27

28          [3] Section 1401(g) was subsequently amended again in 1986, substituting "five
      years, at least two" for "ten years, at least five".

1  required after the age of fourteen, according to Respondent, the only documentary
2  evidence that Petitioner provides "shedding any light" on Stephen Caldera's
3  whereabouts between September 1939 and October 1968 are: (1) a letter from the
4  Mexican Consulate in Los Angeles, California, concerning Petitioner's paternal
5  grandfather's request for repatriation of land in Baja California, Mexico, dated June 4,
6  1936; and (2) a Certificate of Residence issued on August 2, 1939, by the Mexican
7  Consulate in Los Angeles, finding Mexican citizenship and repatriating the Caldera
8  family to Mexico. (Resp't's Mot. 8:15–9:10 (citing Exhibits G & H).) Though these
9  documents provide specific dates when Stephen Caldera may have been present in the
10  United States, they do not provide any durations of time for his physical presence. The
11  same problem exists for the census-records-search information, which merely shows
12  that Stephen Caldera was present in the United States in 1930 and 1960, but not for
13  how long. (See Resp't's Ex. W.)

14      Moving on to the testimonial evidence and written declarations, Respondent
15  broadly contends that this evidence is either unreliable, inadmissible hearsay, or vague
16  and unsupported. (Resp't's Mot. 11:1–20:14.) The Court finds that Respondent's
17  argument over-simplifies the quality of the testimonial evidence and written
18  declarations, but nonetheless reaches the correct conclusion. Most of the testimonial
19  evidence suffers from the same defect as the documentary evidence discussed
20  above—they suggest Stephen Caldera's whereabouts for specific dates, but not for any
21  durations of time. (See Resp't's Ex. D, L, Z, AA, BB, CC.) For example, in the
22  deposition testimony of Ms. Luttrull, Ms. Saak, and Mr. Centeno, these witnesses testify
23  as to when they first met Stephen Caldera and instances when they saw him in the past;
24  their testimony does not provide any information regarding any length of time Stephen
25  Caldera was physically present in the United States. (See id. Ex. Z, AA, BB.)
26  Consequently, such testimony does not provide the Court with any basis to find that
27  Stephen Caldera was present in the United States for any particular duration of time.
28  The same problem exists again in Margarita Caldera Gomez's declaration, which states

1     that she and Stephen Caldera left to live in California together "for less than a year in

2     1968" but fails to include specific information regarding Stephen Caldera. (Margarita

3     Caldera Gomez Decl. ¶¶ 14, 16–18.)

4           Respondent is correct though that Stephen Caldera's deposition testimony is

5     unreliable. He even testified that "my memory doesn't help me anymore," also citing

6     his advanced age. (Stephen Caldera Dep. 9:10–13.) For example, in response to the

7     question of whether he had ever been to Mexico, Stephen Caldera responded, "No, I

8     haven't been there in a long time. I don't know if it's been years already. I don't

9     remember." (Id. at 10:5–8.) And in response to the question of when he first went to

10     Mexico, Stephen Caldera responded, "What? When I went to Mexico? I don't

11     remember. Why make something up? I don't remember." (Id. at 10:9–11.) The

12     inability to recall the past is a pervasive problem throughout the deposition testimony.

13     Setting aside the issue of reliability, Stephen Caldera's testimony nonetheless provides

14     little substance to show that he was physically present in the United States for any

15     particular duration of time during the relevant time period. In fact, the Court was

16     unable to find any instance where Stephen Caldera provided a single date throughout

17     his deposition testimony.

18           Unlike the other declarations provided, Stephen Caldera's declaration provides

19     some relevant information. Specifically, he declares that "in 1947, [he] worked for

20     Cruz and Sebastian Sedillo in Wilmington, California for approximately four months,

21     and that the remainder of the year [he] resided in Mexico," and the same for 1948.

22     (Stephen Caldera Decl. ¶¶ 7–8.) Drawing inferences in light most favorable to

23     Petitioner, these statements suggest that Stephen Caldera resided in California for

24     approximately four months in 1947 and 1948. Stephen Caldera continues that "in

25     1949, [he] worked for Cruz and Sebastian in Wilmington, California for approximately

26     six months." (Id. ¶ 9.) Though the inference is weaker than the previous two

27     paragraphs of the declarations that explicitly mention residence, the Court will

28     nonetheless infer that Stephen Caldera resided in California for approximately six

months in 1949.   The remainder of Stephen Caldera's declaration addressing subsequent years does not provide concrete durations of time for his stays in the United States.   (See id. ¶¶ 10–29.)   These paragraphs of the declaration all state that Stephen Caldera "traveled" between Valle de Guadalupe, Mexico, and Wilmington, California throughout several months of the year from 1950 to 1972.   (See id.)   These paragraphs do not provide enough detail for the Court to conclude that Stephen Caldera was physically present in the United States for any particular duration of time.

Upon reviewing the evidence before the Court, Stephen Caldera's declaration accounts for approximately fourteen months of physical presence in the United States after the age of fourteen between September 1939 and October 1968; the remaining evidence does not provide enough detailed information to account for Stephen Caldera's physical presence in the United States during the relevant time period. Therefore, Petitioner fails to meet his burden to demonstrate by a preponderance of the evidence that he is a United States citizen through his father Stephen Caldera in accordance to 8 U.S.C. § 1401(a)(7) (1968).[4]

## IV.   CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS** Respondent's unopposed motion for summary judgment.  (Doc. 46.)

**IT IS SO ORDERED.**

**DATE: January 7, 2014**

_____

**HON. THOMAS J. WHELAN**
United States District Court
Southern District of California

---

[4] The Court need not address whether Stephen Caldera was physically present in the United States for a period or periods of not less than ten years.